522 A.2d 913
## ATTORNEY GRIEVANCE COMMISSION OF MARYLAND
### v.
### Morris MAZELIS.
**Misc. (Subtitle BV) No. 42, Sept. Term, 1985.**

Court of Appeals of Maryland.

March 24, 1987.

Melvin Hirshman, Bar Counsel and Glenn M. Grossman, Asst. Bar Counsel for Atty. Grievance Com'n of Maryland, for petitioner.

Jack A. Bernstein, Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, COUCH, McAULIFFE and ADKINS, JJ.

PER CURIAM:

The Attorney Grievance Commission, acting through Bar Counsel, filed a petition for disciplinary action against Morris Mazelis, alleging violations of the disciplinary rules of the Code of Professional Responsibility. We referred the matter, pursuant to Maryland Rule BV9 b, to Judge Arrie W. Davis of the Circuit Court for Baltimore City, to make findings of fact and conclusions of law. After conducting an evidentiary hearing, Judge Davis filed findings and conclusions as follows:

"The Respondent was admitted to the practice of law in the State of Maryland by this Court June 12, 1952. In 1983, he was retained by one Sally Lilly to represent her in a personal injury case. Subsequently, on or about September 1, 1983, Ms. Lilly's case was settled and the Respondent received a draft in the amount of $12,968.10 from the insurance company in settlement of her claim. Medical bills reflecting treatment received by Ms. Lilly for the period from May 5, 1983 to August 8, 1983 totaling $835.00 was admitted as Petitioner's Exhibit # 4 on September 15, 1986. Respondent had deposited a settlement check into his escrow account; however, examination of his escrow account indicates that the monies received in settlement of the case were drawn by drafts for personal and/or business purposes. The settlement check received by Respondent included an amount intended to cover the bill of one Harry Brafmann. He testified that his bill was to be paid in full at the time the case was settled. As was the case with the amounts owed to Dr. Felsenberg, Mr. Brafmann was likewise never paid from the proceeds of the settlement. Ultimately Ms. Lilly was obliged to pay the $160.00 bill herself.

The evidence further reveals that Respondent charged Ms. Lilly one fourth of her personal injury protection benefits.

"Respondent was retained in 1983 to represent Towanda Hill in her claim for personal injuries. Respondent received a draft in the amount of $2,300.00 in full settlement of her claim on or about June 17, 1983; said draft was thereafter deposited in Respondent's escrow account on or about June 17, 1983. Sometime prior to June 17, 1983 Respondent had received medical bills in the amount of $175.00 reflecting treatment administered by Dr. Felsenberg and $110.00 for treatment by Harry Brafmann. The said amounts due the health care providers was withheld from the funds received but was never remitted to Dr. Felsenberg or Harry Brafmann. The Client, Ms. Hill, did receive a total of $959.84 from the $2,300.00 settlement check.

"Richard Bauer, Jr. testified that he examined the bank records and that they revealed no payments to the medical care providers from the Respondent's escrow account from June to September of 1983. Additionally, Dr. Felsenberg testified that the Respondent failed to pay him anything in connection with the Towanda Hill case. After unsuccessful attempts to obtain payment, Harry Brafmann resorted to billing Towanda Hill directly and received his payment from her.

"In 1982, Respondent was retained by Jeannie Falls on behalf of her son Rodney Brown, a minor, and was successful in settling Mr. Brown's claim for $2,000.00, receiving a settlement draft in that amount dated December 16, 1982. Respondent received an additional draft for economic loss benefits on the same date in the amount of $270.00. The settlement sheet prepared by Respondent reflected, however, a total settlement of $2,270.00 indicating that he had combined the economic loss benefits received with the proceeds representing the settlement. Prior to the receipt of the settlement draft dated December 16, 1982, Respondent had received medical bills reflecting treatment rendered by Dr. Felsenberg to Rodney Brown in the amount of $255.00. Again, no payment was made to Dr. Felsenberg out of the

settlement check, a portion of which was remitted for that purpose. Rodney Brown's mother, Jeannie Falls, received $1,018.33 of the $2,270.00 received by Respondent.

"In 1983, Respondent was retained by Elizabeth Carter in connection with claims arising out of personal injuries she had sustained. Her case was settled in December, 1983 and the Respondent received $3,900.00 in settlement from the insurance carrier. Respondent's settlement sheet indicates that Dr. Felsenberg submitted a bill in the amount of $685.00, Mr. Brafmann submitted a bill of $175.00, and Dr. Ulgen submitted a bill in the amount of $70.00. Dr. Felsenberg testified that his bill of $685.00 was never paid; likewise, Mr. Brafmann testified that his $175.00 bill for treatment to Ms Carter was never paid. That portion of the settlement proceeds received by Respondent was converted to his own personal use.

"In 1983, Sherman Carter retained Respondent in connection with personal injuries he sustained. The settlement sheet regarding Carter's case indicated a deduction for the payment of Dr. Felsenberg's bill of $485.00; however, despite receipt of a bill from Dr. Felsenberg, the latter was never paid for the treatment rendered to Sherman Carter. Again, the funds earmarked for the payment of bills for medical treatment for Mr. Carter were converted by Respondent to his own personal use.

"In 1983, Jacquelyn Reynolds retained Respondent to represent her with regard to her claim arising from personal injuries she received. In September of 1983, Respondent received a settlement draft in the amount of $3,000.00 as reflected on his settlement sheet. The Respondent deducted $625.00 for the payment of Dr. Felsenberg's bill and $120.00 for the payment of Mr. Brafmann's bill; however, as in the prior cases, Respondent converted those funds earmarked for the medical care providers to his own use.

"According to the testimony of Dr. Felsenberg, Respondent advised him that he could not pay the bills submitted to Respondent because he "just didn't have the money" and

that he had incurred heavy gambling debts. A pattern evolved wherein Respondent consistently advised Mr. Brafmann that he would be paid at some future point in time. The aforegoing facts are a compilation of the admissions made pursuant to the Request for Admissions of Fact of Petitioner and the testimony presented at the hearing in this Court. The only evidence offered of payment on the part of Respondent is contained in a release submitted on September 15, 1986 as Respondent's Exhibit # 3 which recites the discharge of Respondent from any further civil liability growing out of *Stanley Z. Felsenberg, M.D. v. Morris Mazelis, Circuit Court For Baltimore City*, Case No. 84326047 C.L. 27874, appeal having been taken as *Morris Mazelis v. Stanley Z. Felsenberg, M.D.*, Court of Special Appeals, No. 85, September Term 1986. According to the testimony of Dr. Felsenberg, the $30,000.00 set forth in the release represented less than one third of the fees actually due him over the period of time Dr. Felsenberg had been referring clients. When asked on cross-examination why he accepted the $30,000.00 payment in settlement of the civil case filed against Respondent, Dr. Felsenberg responded:

"I wasn't happy doing that. I was given a much lower settlement figure first, but when I got up to this point, on the advice of my attorneys, they said you would be smart to take it and run because by the time Mr. Mazelis finished with all these proceedings he would be no longer earning a living, I might not get anything. And I always believed in listening to my attorneys, especially Russell Smouse who I greatly respect." (T.56–9/15/86)

"Dr. Felsenberg had previously testified that he and the Respondent had been neighbors on Glen Avenue in Baltimore City, had been fairly close personal friends, and had, in fact, gone on vacation together to Florida "many years ago, way back." It was because of this friendship that Dr. Felsenberg had been reluctant to proceed against the Respondent and had allowed the indebtedness to grow to such an amount. It had been Dr. Felsenberg's hope that the

matter could be resolved without resorting to the instant proceedings.

"The only evidence offered by Respondent in his defense other than the before mentioned release was evidence of his medical condition over the past several years. His testimony indicated that he was not precluded from practicing law by reason of any mental illness. He further stated that he suffered from no mental disease, disorder or emotional distress during the period in question from 1982 through 1984. Respondent represents to this Court that he was operated on at Baltimore County General Hospital in March, 1986 for a right femoral popliteal bypass graft and has a prior history of diabetes mellitus, hypertension, and severe arterisclerotic heart disease, having survived a cardiac catherization and coronary angioplasty. Respondent, in summarizing the medical records submitted to this Court on his behalf, states in his Memorandum that Respondent's record do not suggest any history of mental or emotional illness. Notwithstanding the evidence submitted to this Court concerning Respondent's physical condition, there has been nothing offered by Respondent to suggest that the misconduct which forms the subject matter of these proceedings is in any way attributable to a physical and/or emotional condition.

## CONCLUSIONS OF LAW

"This Court is satisfied that the testimony offered at the hearing on the Petition of the Attorney Grievance Commission together with the Exhibits received established clear and convincing evidence that Respondent on the occasions set forth received payment designated for bills submitted by medical care providers to Respondent and has therefore converted and misappropriated the funds entrusted to him. This Court therefore concludes that there have been multiple violations of DR1–102(A)(1), (3), (4), (5), DR9–102(A) and Article 10, Section 44 of the Annotated Code of Maryland. *Attorney Grievance Commission v. Morehead,* 306 Md. 808, 511 A.2d 520 (1986); *Attorney Grievance Commission*

*v. Willemain,* 305 Md. 665, 506 A.2d 245 (1986); *Attorney Grievance Commission v. Boehm,* 293 Md. 476, 446 A.2d 52 (1982). The Respondent's admission as to lack of records in certain instances and his failure to inform both his clients and the medical care providers of the receipt of the proceeds of settlements as well as his disposition of same and his failure to render payment on behalf of his clients clearly demonstrates violation of DR7–101(A)(1), (2), (3) and DR9–102(B)(3). The Respondent has further violated DR2–106(A) in collecting 25 per cent of the personal injury protection proceeds of Ms. Lilly.

"Finally, there has been no demonstration to any degree that the misconduct set forth herein was substantially causally connected to or, for that matter, in any way connected to any illness. See *Attorney Grievance Commission v. Newman,* 304 Md. 370, 499 A.2d 479 (1985); *Attorney Grievance Commission v. Aler,* 301 Md. 389, 483 A.2d 56 (1984); *Attorney Grievance Commission v. Nothstein,* 300 Md. 667, 480 A.2d 807 (1984).

"In conclusion, the conduct of Respondent in this case cannot be said to conform to the standard of performance requisite under the opinions of the Court of Appeals and the disciplinary rules. I therefore conclude that Respondent's conduct constitutes the violations of the rules as set forth herein before."

Bar Counsel took no exceptions to Judge Davis' findings. He recommends disbarment as the appropriate sanction for the respondent's misconduct. The respondent filed exceptions, alleging in effect that the evidence did not justify Judge Davis' findings and that disbarment was not warranted. We disagree. We have reviewed and accept the findings of Judge Davis and conclude, in the absence of a showing of any extenuating circumstances, that disbarment is the appropriate sanction. See *Attorney Griev. Comm'n v. Morehead,* 306 Md. 808, 511 A.2d 520 (1986); *Attorney Griev. Comm'n v. Cockrell,* 304 Md. 379, 499 A.2d 928

(1985) and *Attorney Griev. Comm'n v. Velasquez*, 301 Md. 450, 483 A.2d 354 (1984).[1]

---

**1.** The disciplinary rules which the respondent was found to have violated are as follows:

Disciplinary Rule 1–102

"Misconduct.

(A) A lawyer shall not:
   (1) Violate a Disciplinary Rule.
   (3) Engage in illegal conduct involving moral turpitude.
   (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.
   (5) Engage in conduct that is prejudicial to the administration of justice.
   (6) Engage in any other conduct that adversely reflects on his fitness to practice law."

Disciplinary Rule 2–106

"Fees for Legal Services.

(A) A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee."

Disciplinary Rule 7–101

"Representing a Client Zealously.

(A) A lawyer shall not intentionally:
   (1) Fail to seek the lawful objectives of his client through reasonably available means permitted by law and the Disciplinary Rules, except as provided by DR 7–101(B). A lawyer does not violate this Disciplinary Rule, however, by acceding to reasonable requests of opposing counsel which did not prejudice the rights of his client, by being punctual in fulfilling all professional commitments, by avoiding offensive tactics, or by treating with courtesy and consideration all persons involved in the legal process.

(2) Fail to carry out a contract of employment entered into with a client for professional services, but he may withdraw as permitted under DR2–110, DR5–102, and DR5–105.

(3) Prejudice or damage his client during the course of the professional relationship, except as required under DR7–102(B)."

Disciplinary Rule 9–102

"Preserving Identity of Funds and Property of a Client.

(A) All funds of clients paid to a lawyer or a law firm, other than advances for costs and expenses, shall be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except as follows:
   (1) Funds reasonably sufficient to pay bank charges may be deposited therein.
   (2) Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited

IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE BV15 c FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST MORRIS MAZELIS.

therein, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved.

(B) A lawyer shall:

(3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them.